**Emanual George DEVOSE**

v.

**Larry NORRIS, Director, Arkansas Department of Correction.**

No. PB–C–91–111.

United States District Court,
E.D. Arkansas,
Pine Bluff Division.

Aug. 3, 1994.

Michael Ray Davis, Davis Law Firm, Conway, AR, for plaintiff.

Emanuel George Devose, pro se.

Darnisa C. Evans Johnson, Atty. General's Office, Little Rock, AR, Jeannette Denham, Arkansas Insur. Dept., Little Rock, AR, for defendant.

Ollis Heard, pro se.

## MEMORANDUM OPINION AND ORDER

EISELE, District Judge.

Before the Court is the Petitioner's petition for writ of habeas corpus, the government's response, Petitioner's objections, the Magistrate Judge's Proposed Findings and Recommendations, as well as the tape recordings of the proceedings held before the Magistrate Judge, and various other items requested by the Court related to the hearing held by this Court on July 7, 1994. After careful consideration, for the reasons stated below, the Court has determined that the petition should be granted.

### I. Factual Background/Focusing of Issues

On August 9, 1988, the Petitioner was convicted of delivery of a controlled substance after a jury trial in Jefferson County Circuit Court and was sentenced as a habitual offender to twenty-seven years of imprisonment. At his trial, Robert Thomas, an undercover officer from El Dorado, testified that he and a confidential informant were sitting in a parked car and the informant called Petitioner over to the car and asked him if he had any "rocks" (cocaine) for sale. Thomas testified that Petitioner said that he had one $25.00 rock left. Thomas testified that he then purchased the $25.00 rock from Petitioner. The substance was later tested at the Arkansas Crime Lab, where it was found to be cocaine.

Petitioner appealed his conviction, alleging that 1) there was insufficient evidence to support his conviction; 2) the prosecution used its peremptory strikes in a racially discriminatory manner during jury selection; and 3) the trial court erred in failing to order disclosure of the identity of the confidential informant. Finding no error, the Court affirmed. On September 27, 1989, Petitioner filed a petition in the Arkansas Supreme Court for permission to seek relief under Ark.R.Crim.P. 37, alleging ineffective assistance of counsel; failure to disclose the identity of the confidential informant; improper use of peremptory strikes; failure to disclose a relevant photograph; improper evidentiary foundations for the admission of testimony concerning the cocaine at issue; and insufficiency of the evidence to support a conviction. The Arkansas Supreme Court denied the Petitioner's petition for permission to proceed in circuit court pursuant to Rule 37.

On March 13, 1991, Petitioner filed the present petition for writ of habeas corpus, alleging that his conviction is unconstitutional because the trial court failed to require dis-

closure of the confidential informant; ineffective assistance of counsel; and discriminatory jury selection.[1] The Court will separately consider the issues of racial discrimination during the jury selection process, the failure to disclose the confidential informant, and the failure of the prosecution to disclose other exculpatory material to the defendant prior to trial.

## II. Racially Prejudiced Peremptories

One of the allegations made by Petitioner in this case is that the jury was chosen in a racially discriminatory manner, contrary to the dictates of *Batson v. Kentucky,* 476 U.S. 79, 90–96, 106 S.Ct. 1712, 1719–23, 90 L.Ed.2d 69 (1986). Petitioner agreed to submit this issue on the record. However, during the December 16, 1993 hearing in front of Magistrate Judge Forster, Respondent elicited some testimony on this issue from the assistant prosecuting attorney who tried Mr. Devose's case. This Court further questioned that attorney during its July 7, 1994 hearing.

■ The Court finds that at his state trial, Petitioner established a prima facie case of purposeful discrimination in the jury selection process and that the State failed to articulate a believable neutral explanation for its strikes, thus violating Petitioner's rights under the Equal Protection Clause.

In Jefferson County during the relevant time period, jury panels served for approximately 6 month periods. Toward the end of that time period, after numerous trials, a prosecutor would often be quite familiar with individual members of the panel. In this case, the prosecution was allowed to exercise six peremptory strikes during the selection of the jury, and allowed one peremptory strike during the selection of an alternate juror. After the court asked some very general questions of the panel as a whole, the attorneys for both the state and the defendant were allowed to voir dire the prospective jurors individually. After each prospective juror was questioned, the state would be called upon to either accept or strike the prospective juror. If the state accepted the

prospective juror, the defense was called upon to either accept or strike the prospective juror.

The first prospective juror called, Mr. Ridgway, was a white male. During voir dire, he affirmed that he had "sat in [a juror's] seat several times before." (T.Tr. 33). He was accepted by both sides as Juror 1.

The second prospective juror called, Ms. Moore, was a white female. There was no discussion of her prior jury service. She was accepted by both sides as Juror 2.

The third prospective juror called, Ms. Vereen, was a white female. She affirmed that she had "now served on several juries." (T.Tr. 37). She was accepted by both sides as Juror 3.

The fourth prospective juror called, Ms. Simpson, was a white female. She affirmed that she "sat on a jury before." (T.Tr. 39). She was accepted by both sides as Juror 4.

The fifth prospective juror called, Mr. Neece, was a white male. There was no discussion of his prior jury service. He was accepted by both sides as Juror 5.

The sixth prospective juror called, Ms. Small, was a white female. There was no discussion of her prior jury service. She was accepted by both sides as Juror 6.

The seventh prospective juror called, Mr. Westerman, was a white male. There was no discussion of his prior jury service. The defense struck Mr. Westerman.

The eighth prospective juror called, Mr. Atkinson, was a white male. There was no discussion of his prior jury service. The defense struck Mr. Atkinson.

The ninth prospective juror called, Mr. Thornton, was a white male. There was no discussion of his prior jury service. The defense struck Mr. Thornton.

The tenth prospective juror called, Ms. Clement, was a white female. She had never served on a jury before. (T.Tr. 49). She was accepted by both sides as Juror 7.

---

1. Other issues were also presented. This Court agrees with the Magistrate Judge that the other issues are procedurally barred. The reasoning for that decision is set forth in the Magistrate Judge's Proposed Findings and Recommendations.

The eleventh prospective juror called, Ms. Rawlings, was a black female. During voir dire, the prosecutor stated "... I started to say that you have had the privilege of serving on two juries, but I decided not to because my assumption is that I may be incorrect in characterizing it." Later, the assistant prosecuting attorney stated that "Ms. Rawlings is known to the prosecution, having served on two prior juries before." (T.Tr. 66). Ms. Rawlings was accepted by both sides as Juror 8.

The twelfth prospective juror called, Ms. Colvin, was a white female. During voir dire, while addressing Ms. Colvin, the prosecutor commented that "... as you already know, having served on a jury before, there will come a time today when the Judge will read you the instructions." After the state accepted Ms. Colvin, the defense struck her.

The thirteenth prospective juror called, Mr. Brooks, was a black male. His voir dire proceeded as follows:

BY THE ASSISTANT PROSECUTING ATTORNEY:

Q. Good morning, Mr. Brooks.

A. Good morning.

Q. Mr. Brooks, if I might have a moment, sir. I'm counting. I believe you have actually served now on four juries. Is that correct?

A. Yes, ma'am.

Q. And have sat in that chair under the voir dire on three others. Is that correct?

A. Yes, ma'am.

Q. So, I would assume there's very little that hasn't been asked you at one time or another. Mr. Brooks, is there such a thing as juror burnout?

A. No, ma'am.

Q. So, you can just keep on keeping on. Is that what you're saying?

A. Yes, ma'am.

Q. Mr. Brooks, is anything that's been asked today so peaked your interest that you would like an opportunity to answer a question a little bit differently than perhaps somebody else?

A. No, ma'am.

Q. Thank you.

BY DEFENSE COUNSEL:

Q. Mr. Brooks, I gather, then, from what the prosecutor says, you have had the dubious honor of sitting, actually sitting, on four trials and being up here for discussion for three more, that you would be a top-notch juror. Is your—you are quite familiar then with the conversations, the reasonable doubt, the burden of proof, the presumptions of innocence, you've heard that may times, correct?

A. Correct.

Q. And for you to rule on these and make decisions on those type of things for at least four times, correct?

A. Correct.

Q. I agree. I think you'd make a fine juror, too. Pass.

PROSECUTOR: Your Honor, the State is going to excuse Mr. Brooks today.

(T.Tr. 52–54).

The fourteenth prospective juror called, Mr. Newton, was a white male. There was no discussion of his prior jury service. He was accepted by both sides as Juror 9.

The fifteenth prospective juror called, Ms. Payne, was a white female. There was no discussion of her prior jury service. She was accepted by both sides as Juror 10.

The sixteenth prospective juror called, Ms. Vannoy, was a white female. There was no discussion of her prior jury service. She was accepted by both sides as Juror 11.

The seventeenth prospective juror called, Ms. Shaw, was a black female. Her voir dire proceeded as follows:

BY THE PROSECUTOR:

Q. Ms. Shaw, I believe you've served on a few juries yourself, have you not, ma'am.

A. Yes, ma'am.

Q. Do you recall how long ago you were on that first jury?

A. The first one?

Q. Uh-huh.

A. The first one. It's been—my first one, I think it was in February.

Q. It's been a long time is what you're saying?

A. Yeah.

Q. Ms. Shaw, can you think of any reason why you could not serve today as a fair and impartial juror?

A. No.

Q. Other than burnout?

A. Right.

Q. Thank you, Ms. Shaw.

BY DEFENSE COUNSEL:

Q. Ms. Shaw, how many juries have your served upon up here?

A. I don't know. A lot.

Q. One, two, three?

A. Four or five.

Q. Four or five. So would you be a good juror? You've heard a lot, correct?

A. Right.

Q. Are you suffering from juror burnout, or are you still willing to sit up here and say, "I will listen to the evidence. I will listen to the testimony and I will do what is right and correct"?

A. I will do what's right and correct.

Q. Thank you, ma'am. Pass.

BY THE PROSECUTOR: The State is going to excuse Ms. Shaw today.

BY THE COURT: Ms. Shaw, just a moment. Now, you're just going to have to start getting here on time.

MS. SHAW: Okay.

THE COURT: We are just going to have to start about 30 minutes earlier from when we ordinarily do, and I think you'll get here on time for us. Okay? Thank you, Ms. Shaw. Come back tomorrow morning at 9 o'clock.

(T.Tr. 57–58).

The eighteenth prospective juror called, Mr. Walker, was a white male. There was no discussion of his prior jury service. The defense struck Mr. Walker.

The nineteenth prospective juror called, Ms. Davis, was a white female. She stated that she previously had served on two juries. (T.Tr. 60). She was accepted by both sides as Juror 12.

The first prospective alternate juror called, Mr. Mann, was a white male. He affirmed that he previously had served "on at least two juries." (T.Tr. 60). After the state accepted him, the defense struck Mr. Mann.

The second prospective alternate juror called, Mr. James, was a black male. His voir dire proceeded as follows:

BY THE PROSECUTOR:

Q. Good morning, Mr. James.

A. Good morning.

Q. Mr. James, do you agree with me when I say you've done yeoman's duty on juries.

A. I've been on quite a few.

Q. Have you ever sat in that seat in question to be an alternate?

A. Never.

Q. I didn't think so. Thank you, Mr. James.

BY DEFENSE COUNSEL:

Q. Mr. James, how many juries have you sat on, do you know? Three—two or three, four or five?

A. Four or five.

Q. Four or five. Then you—sir, you've done a good job up here and you know whatever we talking (sic) about here, do you not, sir, all the issues?

A. Yes.

Q. Thank you, sir. Pass

BY THE PROSECUTOR: I'm going to excuse Mr. James, your Honor.

(T.Tr. 61–62).

The third prospective alternate juror called, Ms. Early, was a black female. As both sides had already exercised their one peremptory challenge for the alternate juror, Ms. Early was chosen as the alternate juror.

After jury selection, the Court heard motions out of the hearing of the jury. Defense counsel objected to the selection of the jury as being racially discriminatory in violation of the Equal Protection Clause and in contradiction of the dictates of *Batson v. Kentucky*. The prosecutor responded to this objection as follows:

"... The State will respond by saying that as the Supreme Court of the State of Arkansas has said, the best reason to show non-discrimination is the actual placing of a black on the jury. And out of the 12, for

**842**

the record, I would like it to be noted that Ms. Rawlings is a black juror. Contrary to what counsel for defense has said, Ms. Rawlings is known to the prosecution, having served on two prior juries before. Also, in terms of Mr. James, Mr. James being a black juror was up here under voir dire as an alternate. The defense had already struck a white alternate Robert Mann. Mr. James came up and the prosecution has used Mr. James on numerous trials before.

\* \* \* \* \* \*

... I have used Mr. James four separate times, your Honor. I also am aware of the fact, having used this jury panel many times, that Mr. James has sometimes been one of the reasons my panels have been out for a length of time and has been extremely argumentative. However, your Honor, the State was aware, having used this panel many times, that the next person up, Ms. Areather Early, is indeed black and was placed as an alternate.

\* \* \* \* \* \*

The other thing that the State would like to respond to, your Honor, is that the State only used two strikes out of a possible six during jury selection. The other point the State would like to raise is that I would have to have time to count, but of the people that came before us in voir dire, a preponderance of them were white.

\* \* \* \* \* \*

... (O)f the ones that were called, a preponderance of them were white to begin with, your Honor. The State feels that under Arkansas law, we have not shown a pattern of discrimination, having placed one black juror on the jury and the other black person was placed as an alternate.

\* \* \* \* \* \*

... (I)t's not that the State has excused them because they've done a good job, your Honor, the State has excused them because they have worked on so many trials. We feel like that they have been burned out at this point, and, indeed, have gotten information in past trials that that is the case.

(T.Tr. 66–68). The *Batson* issue was brought up again post-trial, after the jury retired to deliberate. The prosecution did not comment during this post-trial discussion between defense counsel and the court.

▉ The Equal Protection Clause forbids a prosecutor from using peremptory challenges to exclude otherwise qualified persons from the petit jury solely on account of their race. *Batson,* 476 U.S. 79, 106 S.Ct. 1712. In order to establish an equal protection violation, "a defendant must first establish a prima facie case of purposeful discrimination in selection of the jury panel." *United States v. Battle,* 836 F.2d 1084, 1085 (8th Cir.1987). To establish a prima facie case of purposeful discrimination, the defendant must first show that the prosecutor exercised peremptory challenges to remove members of a cognizable racial group from the venire. *Batson,* 476 U.S. at 96, 106 S.Ct. at 1722–23. The defendant must also show that "these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race." *Id.* In deciding whether the defendant has made the requisite showing, the trial court should consider all relevant factors. *Id.* For example, a "pattern" of strikes against black jurors on the panel might give rise to an inference of discrimination. *Id.* "... (I)t is important to observe that a prima facie case may be made where relevant circumstances indicate an inference of purposeful discrimination no matter that one or more black persons may remain on the jury." *Battle,* 836 F.2d at 1086.[2] "(U)nder *Batson,* the

---

**2.** In the case at bar, the Arkansas Court of Appeals found that the prosecuting attorney used two of six peremptory strikes during jury selection to strike two prospective jurors, and used one strike to exclude a prospective alternate juror, who was black. The Court held that because the State had four peremptory challenges remaining and one black juror was seated on the

jury and another black person was chosen as an alternate, the Petitioner failed to establish a prima facie case of purposeful discrimination. This Court finds that this holding was plain error. When the State had peremptory strikes available, it used them to strike three of the four blacks called for voir dire. There is no indication in the record that there was any significant non-racial

striking of a single black juror for racial reasons violates the equal protection clause, even though other black jurors are seated, and even when there are valid reasons for the striking of some black jurors." *Id.*

 After a defendant establishes a prima facie case, the burden shifts to the government to "articulate a neutral explanation related to the particular case to be tried." *Batson,* 476 U.S. at 98, 106 S.Ct. at 1724. The mere articulation of a non-discriminatory reason is not always sufficient for establishing a lack of purposeful discrimination. The court should look at all relevant circumstances to determine if the articulated reason is pretextual. For instance, in this circuit "it is well established that the government may not justify peremptory challenges to venire members of one race unless venire members of another race with comparable or similar characteristics, are also challenged." *Reynolds v. Benefield,* 931 F.2d 506, 512 (8th Cir.1991). The court must make a final determination of whether the defendant has established purposeful discrimination. *Batson,* 476 U.S. at 98, 106 S.Ct. at 1724.

 At Petitioner's trial, a total of 22 prospective jurors were questioned to serve as either a juror or the alternate juror. Ten of those jurors specifically stated that they had served on previous juries, including four of the five blacks. The one black juror who did not specifically so state was Ms. Early, who was chosen to be the alternate juror after both sides had used their one peremptory strike. The state exercised a total of three peremptory strikes. All of those strikes were used against black prospective jurors.

The first black juror called, Ms. Rawlings, had served before and was accepted as Juror 8. The next three black jurors called were stricken by the state. The state asked Mr. Brooks, the thirteenth juror called and the second black juror called, whether he suffered from juror burnout. He stated that he did not. Five other jurors had already stated that they had previously served on juries. None were questioned about juror burnout.

More indirectly, the state questioned Ms. Shaw, the seventeenth juror called and the third black juror called, about juror burnout: "Q. Ms. Shaw, can you think of any reason why you could not serve today as a fair and impartial juror? A. No. Q. Other than burnout? A. Right." (T.Tr. 57). Defense counsel followed this up with the following: "Q. Are you suffering from juror burnout, or are you still willing to sit up here and say, 'I will listen to the evidence. I will listen to the testimony and I will do what is right and correct'? A. I will do what's right and correct." (T.Tr. 58).

After Ms. Shaw, two white jurors, Ms. Davis and Mr. Mann, stated that they had served before. They were not questioned about juror burnout, and the state accepted both, although the defense subsequently struck Mr. Mann. Then Mr. James, the fourth black juror called, was questioned. His voir dire, quoted *supra,* focused solely upon his prior service, although he was not specifically questioned about burnout. The fifth and final black juror was called after each side had used its only peremptory strike against a prospective alternate juror, and she was not questioned about her prior jury service at all. As neither side had any more peremptory strikes to exercise, and no reason appeared to excuse her for cause, Ms. Early served as the alternate juror.

It is true that the record indicates that Ms. Shaw, Mr. Brooks, and Mr. James had all served on four to five juries. The record is not specific for most of the other jurors. Ten white prospective jurors and Ms. Early were not questioned about their prior jury service and therefore the Court cannot determine how many times they may have served previously. Two jurors indicated that they had served "several" times. Three jurors indicated that they had served twice before. Ms. Simpson stated that she had served once. Ms. Clement had never served. The primary justification offered by the state for its striking of the black jurors was "juror burnout". And yet, a portion of the State's questioning of a white juror proceeded as follows:

distinction between these black jurors and the white jurors who were accepted. The defendant

established a prima facie case of purposeful discrimination.

Q. Mr. Ridgway, you have sat in that seat several times before, have you not, sir?

A. Yes, ma'am.

Q. For that reason, I would assume that you now have, in your own mind, a clear understanding of what is meant by beyond a reasonable doubt. And if, at the conclusion of the evidence today, you are convinced of the guilt of the defendant beyond a reasonable doubt, can you vote to convict him and to sentence him to the penitentiary?

(T.Tr. 33). It would appear that white jurors with prior experience were seen by the State as having a clearer understanding of certain issues, making them desirable jurors. Black jurors with prior experience were perceived by the State as suffering from juror burnout, even when they specifically stated that they were not so suffering, or that they would do what was "right and correct." This Court finds that the State's articulated reasons in the record were pretextual, and that the Petitioner established purposeful discrimination by the State in the jury selection process.

Although it is not necessary to its holding, the Court will address the subsequent testimony by the assistant prosecuting attorney regarding jury selection. During the December 16, 1993 hearing before Magistrate Judge Forster, Respondent questioned the assistant prosecuting attorney about her strikes against prospective black jurors. She stated that she had information that the jurors had sat on several juries in the recent past. She also stated that she had conducted exit interviews with some of the jurors after some of the other trials, and that she had information that two to three particular jurors were "tired of being there." The identity of these two to three particular jurors was not set forth.

In the hearing held before this Court on July 7, 1994, the assistant prosecuting attorney was again questioned about her strikes against prospective black jurors. She stated that she remembered a young black woman, whom she thought was named Shaw. The first thing that the assistant prosecuting attorney said was that she remembered Shaw coming in late, and that she had come in late several times before. She testified that she remembered that at the trial, six years ago, the judge had admonished Juror Shaw and had asked that she try to arrive about thirty minutes earlier. This July 1994 testimony was the first time that Ms. Shaw's tardiness was ever articulated as a reason for her excusal from Petitioner's jury.

The assistant prosecuting attorney stated that she was "hazy" about "the other black", which the record indicates was Mr. Brooks. She stated that she just didn't remember the reason for her strike. She said that she remembered Ms. Early and remembered striking a black person before her because "quite frankly, I wanted to reach Ms. Early ..." This was the first time that this reason had been articulated.

The assistant prosecuting attorney testified that she did not conduct formal exit interviews, but that some of the jurors were well known to her and that some of those people "in an aside at a social occasion" may have given her "information" about other jurors. She emphasized that she had worked with these jurors before, and that she had grown up in Pine Bluff and knew some of these people and their families. She stated that she had her own private notes on each of the jurors.

The Court is troubled by the practice of allowing jurors to speak with prosecutors about the intricate interaction that occurs amongst jurors during deliberations, when the panel is still being used and the prosecutor can use such information in its selection of jurors in future cases.[3] The State certainly can not rely upon such secret and undocumented, nebulous hearsay, referred to simply as "information", as a justification for the exercising of peremptory strikes against a cognizable racial group when the record discloses no other significant non-racial distinc-

---

**3.** The practice also has the potential of creating an improper personal relationship between the prosecutor and the prospective juror. And the potential, usually in favor of the prosecution, is greater when petit jurors serve for six months and try many cases handled by the same prosecutor.

tions between the jurors stricken and the jurors accepted.

The Court is disinclined to credit the supplemental reasons offered by the assistant prosecuting attorney as to Ms. Shaw and Mr. James, reasons which were articulated for the first time six years after the trial of Petitioner. The Court finds that the State has failed to articulate a non-pretextual, legitimate, non-discriminatory reason for its strikes against Ms. Shaw, Mr. Brooks, and Mr. James. Mr. Devose's conviction by a jury chosen in a racially discriminatory manner cannot stand.

### III. Disclosure of the Confidential Informant

■ According to the testimony of Officer Thomas, the drug buy in question occurred in the following manner:

"Me and a confidential informer drove to Third and State Street which is a center where a lot of the drugs are being pushed here in Pine Bluff. Sitting out there in the parking lot, confidential informer noticed Curtis Jones walking in the area. He called him to the vehicle—undercover vehicle. He asked him did he have any cocaine rocks for sale. Mr. Jones stated, "Yes." He had one cocaine rock left. That's all he had left, and I—he asked how much it was, and he stated $25. I told Mr. Jones that I was—that I wanted to buy that last $25 rock he had. He reached into his right pocket and handed me the cocaine rock. I looked at it and then handed Mr. Jones $25. Then myself and the confidential informer left the area."

(T.Tr. 88). Thus, it appears that there were three witnesses to the drug transaction: Officer Thomas, a CI, and an individual who goes by the name "Curtis Jones." Officer Thomas subsequently identified Petitioner as Mr. Jones.

On July 21, 1988, Petitioner filed a motion for the disclosure of the confidential informant. Specifically, he requested the name, address and telephone number and any testimony of the confidential informant so as to enable Petitioner to properly present his defense at trial. This Motion was not formally taken up prior to the trial date. It is clear from a reading of the trial transcript, however, that it was taken up prior to trial. After the jury retired to deliberate, we have the following discussion on the record:

THE COURT: Let's get some matters on the record that we have previously taken up at the bench. Mr. Brown, do you want to go ahead and proceed with the matters you want to put on the record?

DEFENDANT'S COUNSEL: Yes, your Honor. On the 21st of this month I filed a motion for discovery of the confidential informant. That hasn't been responded to and **this morning when we were in chambers, I again, you know, requested that the Court order the prosecutor to disclose the confidential informant.** I realize that wasn't on record at that time. We were just in chambers discussing it, and my position is that when a confidential informant is present with the police officer when a drug transaction occurs, and witnesses the transaction and could shed obvious light on the perpetrators, then the prosecution is obliged to disclose the name and address and phone number of the confidential informant. They have not done so. I would—since we weren't on record, I moved for that disclosure and, of course, a mistrial because of the failure to disclose or, alternatively, a continuance.

ASSISTANT PROSECUTOR: Your Honor, I don't think the defense counsel can have it either way. He either says that there was a confidential informant there at the time of the drug transaction, and therefore, his client was there, or there was not a drug transaction. He is using an alibi as a defense today. So, I think that is contradictory in and of itself. However, because of where it went down, **I believe that the confidential informer had no exculpatory information that he could have given.** Defense counsel has made no assertion that the buy went down in any other manner than is asserted here by the prosecution; and, therefore, I don't think the confidential informant is necessary to testify. He can't clear up any disputed testimony that I can see.

DEFENSE COUNSEL: Well, the point I was trying to make is, is if he'd been disclosed to me, then I could have talked

with him and made a determination as to whether or not there was any exculpatory [sic]. This way we'll never know.

(T.Tr. 163–64) (emphasis added). Thus, the trial court denied Petitioner's Motion for Disclosure of the Confidential Informant based upon the State's representation that the CI had no exculpatory information to provide.

During the hearing before this Court, the assistant prosecutor was further questioned about the possibility that the confidential informant could provide exculpatory information. She stated that she herself knew nothing about the confidential informant, and that she had never spoken to him, and never read a statement prepared by him. She did not even know his name until the July 7, 1994 hearing. Yet she assured the trial court that this CI, an eyewitness to the alleged transaction, had no exculpatory information to provide.

For background purposes, it is important to note how it came about that Mr. Devose was charged with this crime. On May 21, 1988, Officer Thomas and the CI allegedly made a number of drug purchases. Officer Thomas claims that the CI told him that the person from whom he bought the drugs at issue in this case was named Curtis Jones. An Information was filed accusing "Curtis Jones" of the instant offense. On June 3, 1988, Mr. Devose was brought in on other charges. According to Mr. Devose, on June 3, 1988, another officer came in and asked him if he was Curtis Jones. He told the officer that he was not. The officer said that he thought Mr. Devose was, in fact, Curtis Jones. On June 16, 1988, a new Information was issued, charging Emanuel (sic) George Devose, a/k/a Curtis Jones, with delivery of a controlled substance.

Neither the confidential informant nor Officer Thomas were called in to identify Mr. Devose as the person that had participated in the drug transaction. Indeed, Officer Thom-

as never saw Mr. Devose between the time of the incident and the trial of Mr. Devose, a/k/a Curtis Jones. There was nothing in any police records, or, as far as the Court can determine, anywhere else to indicate that Mr. Devose was also known as Curtis Jones. Mr. Devose has no record of drug offenses. So, the State proceeded to trial based upon the apparently random decision of an officer who was not present for the drug transaction at issue, for some unarticulated reason, he thought that Mr. Devose and Mr. Jones were one and the same. At trial, Officer Thomas did identify Mr. Devose as Mr. Jones. He also insisted that in spite of the fact that his report described the Curtis Jones as approximately 6'2″ tall, whereas Mr. Devose is approximately 6'9″ tall, there was no significant variance.

The CI was called in to testify outside the presence of Mr. Devose, both before the Magistrate Judge and this Court. The proceedings before the Magistrate Judge, with the CI answering questions propounded by Petitioner's present counsel, were, in pertinent part, as follows:

"Q. Did you ever work with a Robert Thomas?

A. Yes, I did.

Q. Okay. Do you know whether or not you were with him on May the 21st of 1988?

A. If it was on a Friday I believe I was. I'm not for sure.

Q. Okay. Now were you with him when he let you purchase some rock cocaine from a Curtis Jones?

A. Yes, I was.

Q. Do you remember what Mr. Jones looks like?

A. Not too good, not his face too good.

[CI shown photographs]

A. I see Emanual. But I don't see Curtis Jones.[4]

---

**4.** It should be noted that Mr. Devose has never had the opportunity to personally confront the confidential informant. His *pro se* filings have argued that if he was present at the drug transaction, he would know who the confidential informant was and there would be no need to protect his identity. It is clear that Mr. Devose assumed

that he did not know the confidential informant, and this was why his attorney attempted to "smoke out" the confidential informant in the hearing before the Magistrate Judge by utilizing a photographic line-up. The confidential informant has since testified that he did know Mr. Devose, and in fact grew up with him. The

Q. You know Emanual Devose?

A. Yes.

Q. Is Curtis Jones who you bought the rock from, for Robert Thomas?

A. His name Emanual Devose? That's the one I bought the cocaine from, we got the cocaine from.

Q. On the 21st of—

A. I'm not sure on what date, you know, the exact date, but I know me and Robert did make a buy off Devose.

Q. Now, Mr. Thomas indicated that the person he made the buy off was Curtis Jones.

A. No. Not to my knowledge. I know we made a buy—made buys off of Devose but we didn't make no buy—to my knowledge off no Curtis Jones that I know of."

One minute, the CI testified that he bought from a Curtis Jones. Literally the next minute, or at most two minutes later, he "didn't make no buy—to [his] knowledge off no Curtis Jones ..." The CI also testified that he had known Emanual Devose for years, and had gone to school with his Emanual Devose's brother. In testimony before this Court, the CI claimed that he never told Officer Thomas that the individual who sold Officer Thomas the drugs in question was Curtis Jones. He said that he "knew of" someone named Curtis Jones, but he did not actually know him. Further, the CI testified that he told Officer Thomas that the individual in question was named "Sleepy".

Petitioner has submitted affidavits proclaiming that he has never been known as "Sleepy". Petitioner's brother, Anthony Devose, submitted an affidavit proclaiming that he, Anthony Devose, is known as "Sleepy". Anthony Devose's prison records reflect "Sleepy" as an alias. Although Anthony Devose is presently incarcerated, he was free at the time of the instant offense. He is approximately 6'2" tall. The Court has also been informed that there is a Curtis Jones in the Pine Bluff area, but knows no details about that individual.

The Court also notes that Mr. Devose testified on his own behalf before this Court. The Court was very impressed with Mr. Devose's credibility. Mr. Devose has adamantly and steadfastly maintained his innocence. Indeed, in response to questioning by the Court he volunteered to take a polygraph examination. While these things are certainly not dispositive, they add to the numerous factors undermining this Court's confidence in Mr. Devose's conviction.

The courts have addressed the problems of determining when the identity of a confidential informant must be disclosed:

"We believe that no fixed rule with respect to disclosure is justifiable. The problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense. Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors."

*Roviaro v. United States,* 353 U.S. 53, 62, 77 S.Ct. 623, 629, 1 L.Ed.2d 639 (1957).

"Where the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way."

*United States v. Ordonez,* 737 F.2d 793, 809 (9th Cir.1984) (*citing Roviaro v. United States,* 353 U.S. at 58–62, 77 S.Ct. at 627–28).

In this case, unlike *Roviaro,* the confidential informant was not the only person other than the accused present at the scene of the crime. However, as set forth below, the third person allegedly at the scene, Officer Robert Thomas, has serious credibility problems that were not disclosed to the Petitioner prior to trial. Furthermore, there were numerous problems with the identification by Officer Thomas. These problems make the CI's testimony, and cross-examination, cru-

confidential informant was also told, prior to the hearing, the name of petitioner. Clearly, he was aware that he was expected to identify Mr. Devose. The photographic identification was thus rendered meaningless.

cial. Below are excerpts from Thomas's testimony:

"A. Me and a confidential informer drove to Third and State Street which is a center where a lot of the drugs are being pushed here in Pine Bluff. Sitting out there in the parking lot, confidential informer noticed Curtis Jones walking in the area. He called him to the vehicle—undercover vehicle. He asked him did he have any cocaine rocks for sale. Mr. Jones stated, "Yes." He had one cocaine rock left. That's all he had left, and I—he asked how much it was, and he stated $25. I told Mr. Jones that I was—that I wanted to buy that last $25 rock he had. He reached into his right pocket and handed me the cocaine rock. I looked at it and then handed Mr. Jones $25. Then myself and the confidential informer left the area.

Q. Officer, the man that you are referring to as Curtis Jones that you bought the cocaine from that night, do you see him in the courtroom today?

A. Yes, ma'am, I do. [Identifies defendant Emanual Devose.]

\*　\*　\*　\*　\*　\*

Q. ... You did a report, did you not?

A. Yes, I did.

Q. And I believe you said that he was 6′2 to 6′4?

A. Yes.

Q. He had dark skin and wavy black hair?

A. Yes.

Q. How do you define wavy black hair? Do you have wavy black hair?

A. Yes, I do.

Q. This is wavy black hair?

A. Yes, no curls, long wavy.

Q. Long, wavy curls. And you are saying my client here, except for maybe the length of his hair, looked now like he looked back then?

A. No, he didn't. His hair was straighter.

Q. His hair was straight?

A. And longer.

Q. And long. Okay. What about his eyes? I don't see anything in your report about his eyes.

A. That's not necessary.

\*　\*　\*　\*　\*　\*

Q. You do not consider his eyes—I mean, they are really big. They're almost—they are bug eyes.

A. Yeah.

Officer Brown's report also described the petitioner as being 6′2 to 6′4. Petitioner claims to be 6′8 to 6′9″.

▮▮▮▮　In cases involving tipsters who merely convey information to the government but neither witness nor participate in the offense, disclosure is generally not material and is therefore not required. *United States v. Bourbon,* 819 F.2d 856, 860 (8th Cir.1987). Where the witness is an active participant or witness to the offense charged, disclosure will almost always be material to the accused's defense. *United States v. Barnes,* 486 F.2d 776, 779–79 (8th Cir.1973).

In this case, Officer Thomas's identification of Petitioner was fraught with inconsistencies. Officer Thomas's credibility is, as discussed below, suspect. The testimony of the confidential informant before the Magistrate Judge and this Court indicates that his own statements are extremely shaky, and those statements do not mesh very well with the statements of Officer Thomas. This combustible combination should have been discovered and disclosed. Perhaps, had the assistant prosecutor spoken with the confidential informant prior to trial, she would have been less likely to assure the Court that the confidential informant had nothing material to add to these proceedings. The failure of the trial court to order disclosure of the identity of the confidential informant in this case was error. Petitioner's conviction cannot stand.

## IV. The Importance of Impeaching Evidence

The Court of Appeals of Arkansas's affirmance of Petitioner's conviction on June 14, 1989 cited only the testimony of Officer Robert Thomas to support its conclusion that there was sufficient evidence upon which the

jury could find petitioner guilty beyond a reasonable doubt. The court stated:

> At trial, Robert Thomas, an undercover officer from El Dorado, testified that he and a confidential informant were sitting in a parked car and the informant called DeVose over to the car and asked him if he had any "rocks" (cocaine) for sale. DeVose replied that he had one left for $25.00. The officer then told DeVose that he would like to purchase the rock. DeVose pulled the rock out of his pocket and sold it to Officer Thomas for $25.00. The substance was tested at the Arkansas Crime Lab where it was found to be. cocaine.
>
> The accuracy of the officer's recollection of events, the identification of appellant, and the alleged weaknesses of the officer's testimony were matters of credibility to be resolved by the jury. See *Davis v. State,* 284 Ark. 557, 683 S.W.2d 926 (1985). The jury may accept or reject any part of the testimony of a witness. *Gilliam v. State,* 294 Ark. 115, 741 S.W.2d 631 (1987). We need only consider testimony lending support to the jury verdict and may disregard any testimony that could have been rejected by the jury. *Sparks v. State,* 25 Ark. App. 190, 756 S.W.2d 911 (1988). Looking at the evidence in its entirety we hold that it was sufficient to support the appellant's conviction.

So, we see the importance of Officer Thomas' testimony in this case. The Court requested the respondent to produce Mr. Thomas at the hearing on July 7, 1994 so that he might be further examined by the parties and the Court.

The State advises that it has not been able to find Mr. Thomas and does not know of his present whereabouts. It is clear to the Court that the credibility of Officer Thomas was, and is, the key issue in this case. We now know that Robert Thomas (the sole eyewitness at trial) had been disciplined for theft and making false statements to a supervisor and a prosecuting attorney while a police officer and *before* the trial of Petitioner. Specifically, the following incidents have now been brought to the Court's attention:

a. According to a letter dated 3–30–87, Officer Thomas was suspended for one week without pay for violation of "Personnel Regulation 227, Deportment"; on this same date he was suspended for one week without pay for giving a false statement in his initial interview with Captain Holt; his probationary status was extended for six months.

b. On 2–22–88, Officer Thomas was suspended without pay for ten days for making untruthful statements to Deputy Prosecuting Attorney Pat Compton and warned that another incident involving untruthfulness would result in termination.

c. In early April 1990, Officer Thomas was investigated for theft of property during drug raids. He apparently admitted that he had taken a silk suit, a woman's watch, and some "whatnots" from the wall. He stated that he took a $50.00 bond "as evidence." After being told that he had not done well on a polygraph exam, he further admitted to taking a woman's gold ring.

Petitioner was tried in August of 1988. The first two incidents involving a false statement to Officer Holt and untruthful statements to Deputy Prosecuting Attorney Pat Compton had already occurred and were not disclosed to Petitioner prior to trial. The latter incident occurred post-trial, but prior to the filing of the instant petition. It was not disclosed. Petitioner's attorney discovered this information because another attorney told him about an experience that this other attorney had had with this officer. After the Court's hearing on July 7, 1994, the State confirmed that the above incidents occurred. The State also referenced a disciplinary received by Officer Thomas on September 11, 1986. The circumstances of that disciplinary are not in the record before the Court. It appears that Officer Thomas began working with the El Dorado police department on June 29; 1986 and that he resigned on April 11, 1990.

The prosecuting attorney testified at the July 7, 1994 hearing that Officer Thomas had been used extensively in undercover drug work around the time of the instant incident. Indeed, she stated that she herself had many drug cases based upon the

testimony of Officer Thomas. She further testified that she was unaware of Officer Thomas's record for untruthfulness until the time of the hearings in the present petition. She stated that had she been aware of Officer Thomas's disciplinaries, she would have disclosed same to Mr. Devose prior to his trial, recognizing the value of the information as impeachment evidence against the sole testifying eye-witness to the transaction. The Court credits all of those statements by the prosecuting attorney as true.[5]

In *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the United States Supreme Court held that the government, upon request, must disclose exculpatory evidence to a criminal defendant. Explaining that decision, the Court later stated:

> "The heart of the holding in *Brady* is the prosecution's suppression of evidence, in the face of a defense production request, where the evidence is favorable to the accused and is material either to guilt or to punishment. Important, then, are (a) suppression by the prosecution after a request by the defense, (b) the evidence's favorable character for the defense, and (c) the materiality of the evidence."

*Moore v. Illinois*, 408 U.S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972). When information would have undermined the credibility of the government's key witness, the prosecution's duty of disclosure is triggered. *See, Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972). The determination of a *Brady* violation is objective; the prosecutor's good or bad faith is not relevant. *United States v. Joseph*, 996 F.2d 36, 39 (3rd Cir.1993).

Typically, a prosecutor's duty under *Brady* is quite clear. The exculpatory information will have been developed during preparation for the case being prosecuted, such as the discovery of a witness at a crime scene who suggests to the investigating police that he could not identify the defendant as the perpetrator. *Id.* The determination of a prosecutor's duty under *Brady* is more difficult when the exculpatory information is available to the prosecution but is not within its actual knowledge in the context of the particular case in which a defendant asserts that there has been a *Brady* violation and the existence of the information is understandably unknown by the prosecutor in that context. *Id.*

**5.** The Court notes that this issue has not been formally presented to it, but notes Mr. Devose's mention of Mr. Thomas's record in his more recent filings. Even the state prosecutor claims not to have known of Officer Thomas's personnel difficulties until these hearings, and on January 8, 1993, the Magistrate Judge refused to order the state to provide Petitioner with those records upon specific request. If the Petitioner has procedurally defaulted his federal claims, he can obtain review if he shows cause for his default in state court and actual prejudice as a result of the constitutional violation. *Wainwright v. Sykes*, 433 U.S. 72, 88–90, 97 S.Ct. 2497, 2507–08, 53 L.Ed.2d 594 (1977); *Engle v. Isaac*, 456 U.S. 107, 129, 102 S.Ct. 1558, 1572, 71 L.Ed.2d 783 (1982). Where a prisoner defaults his entire appeal, the cause and prejudice standard applies. *Coleman v. Thompson*, 501 U.S. 722, 748–51, 111 S.Ct. 2546, 2564–65, 115 L.Ed.2d 640 (1991).

The existence of cause "must ordinarily turn on whether the prisoner can show some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488, 106 S.Ct. 2639, 2645, 91 L.Ed.2d 397 (1986). For example, a showing that the factual or legal basis for the claim was not reasonably available to counsel, that some interference by officials made

compliance impracticable, or that counsel's performance was constitutionally ineffective under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) would constitute factors external to the defense and cause for a procedural default.

In this case, the factual basis for a claim of a *Brady* violation was not reasonably available to Petitioner's counsel, thereby establishing "cause".

It is well established that a new trial must be granted when the prosecution fails to disclose impeaching evidence before trial if the evidence is material, that is, "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985). For reasons set forth below, the Court also finds that the petitioner is able to satisfy the "prejudice" prong of *Wainwright v. Sykes*. The Court thus concludes that Petitioner's *Brady* claim fits within the "cause and prejudice" exception to the general rule of procedural bar, and the Court will consider the claim on the merits.

The Third Circuit has held that the prosecution is obligated to produce certain evidence actually or constructively in its possession or accessible to it. *United States v. Perdomo*, 929 F.2d 967, 970 (3rd Cir.1991). Factors to consider include the specificity of the defendant's request for particular information, which could serve to direct the prosecutor's attention toward the type of information they were seeking. *Joseph*, 996 F.2d at 40. Thus, where the defendant makes a specific request for any information relating to the criminal background of any of the prosecution's witnesses, and the prosecution erroneously informs the defendant that its key witness did not have a criminal record based upon a National Crime Information Center check which failed to turn up the criminal record, the Third Circuit found a *Brady* violation because the prosecution had been alerted to the defendant's specific concern and the information was readily available to the prosecutor. *Perdomo*, 929 F.2d at 970. On the other hand, when the defendant simply makes a generic request for exculpatory evidence, it is much more difficult to show constructive possession under the Third Circuit's approach. *Joseph*, 996 F.2d at 40.

Other circuits have also addressed this issue. The District of Columbia Circuit Court noted that it was joining the Third, Fifth and Seventh Circuits in its decision to extend the prosecutor's duty under *Brady* to information that is available to the prosecution but of which none of the prosecutors are actually aware. *United States v. Brooks*, 966 F.2d 1500, 1502 (D.C.Cir.1992). The Court stated:

"In extending the *Brady* duty to searches for evidence, the 5th Circuit framed the matter as one of incentives for the government, arguing that without the extension 'we would be inviting and placing a premium on conduct unworthy of representatives of the United States Government.' *United States v. Auten*, 632 F.2d 478, 481 (5th Cir.1980). The 7th Circuit has sounded a similar note, warning that a 'prosecutor's office cannot get around *Brady* by keeping itself in ignorance, or compartmentalizing information about different aspects of a case.' *Carey v. Duckworth*, 738 F.2d 875, 878 (7th Cir.1984).

\* \* \* \* \* \*

We suspect the courts' willingness to insist on an affirmative duty of inquiry may stem primarily from a sense that an inaccurate conviction based on government failure to turn over an easily turned rock is essentially as offensive as one based on government non-disclosure. *See, e.g., Calley v. Callaway*, 519 F.2d 184, 223 (5th Cir.1975) (*en banc*) (reflecting concern for 'inherent fairness').

*Id.* at 1502–03. The *Brooks* Court noted that the cases finding a duty to search have principally involved files maintained by branches of government which are closely aligned with the prosecution. *Id.* at 1503. In each such case, the court has found the "bureaucratic boundary" too weak to limit the duty. *Id.*

"Thus in *Auten* the duty reached the key witness's convictions in the FBI and National Crime Information Center files, see 632 F.2d at 480–81; in *United States v. Deutsch*, 475 F.2d 55 (5th Cir.1973)—possible adverse information in the personnel file of a Post Office employee who testified that defendants sought to bribe him; in *Fairman* (a state prosecution)—the worksheet of a Chicago police officer who had testified for the prosecution at a trial involving an attack on Chicago police officers. But cf. *United States v. Zavala*, 839 F.2d 523, 528 (9th Cir.1988) (*Brady* does not extend to reports in the hands of the court or probation office)."

*Id.* at 1503. In analyzing whether the duty to search was triggered in a particular case, the D.C. Circuit found that in some cases, the duty to search flowed directly from the nature of the files, such as the duty to search the FBI and National Crime Information Center records for criminal records of the government's key witnesses. *Id.* In other cases, consideration must be given to whether there was enough of a prospect of exculpatory material to warrant a search. *Id.*

The Eighth Circuit has also discussed a prosecutor's duties under *Brady*:

"This duty of candor, while substantial, is not all encompassing. It neither requires full disclosure as in civil cases nor permits a 'combing of the prosecutors' files' in search of evidence possibly useful to the accused. It has been limited to evidence

favorable to the accused, material to his guilt or punishment, **and evidence affecting the credibility of a key witness when his reliability may be determinative of guilt or innocence."**

*Evans v. Janing,* 489 F.2d 470, 474 (8th Cir.1973) (footnotes omitted) (emphasis added).

▉ The prosecutor in Mr. Devose's trial admits that she frequently relied upon the testimony of Officer Thomas in drug cases. In many cases, the only parties to an undercover drug transaction are the accused and the undercover officer. In other cases, like this one, even if there were other parties present, the undercover officer is the only government witness to testify. In this case, Officer Thomas's testimony was absolutely crucial to the State's case. His reliability could have been determinative of guilt or innocence. The personnel records of a police officer being used in state prosecutions are rocks easily overturned by the government.

The *Brady* request filed in this case is perhaps not perfectly specific. It reads in pertinent part as follows:

"The defendant requests that the Court issue its order directing the Prosecuting Attorney to disclose to defense counsel the following information and material as is now or may in the future come within the possession, custody, control or knowledge of the Prosecuting Attorney or any state or federal agency acting in concert therewith in the furtherance of this case, and further permitting defense counsel to inspect test, copy and photograph said information and material, to wit:

\* \* \* \* \* \*

The Defendant requests a copy of the record of prior convictions of persons whom the Prosecuting Attorney intends to call witnesses at any hearing or any trial which information is within the possession, custody or control of the State or through due diligence may come within the possession, custody, or control of the State.

\* \* \* \* \* \*

The Defendant requests that the State disclose to the Defendant's attorney all evidence favorable to the accused which is material, either to his guilt or his innocence or as to punishment, and if any such evidence or witnesses by furnished to this Defendant together with a copy or a resume of such evidence which is within the possession, custody or control of the State. This Defendant specifically requests all statements of witnesses, exhibits, and testimony with will tend to exculpate, or in any way provide mitigating factors in connection with this Defendant's alleged commission of the offenses charged which evidence is within the possession, custody or control of the State or through due diligence may come within the possession, custody or control of the State. This request is specifically made under DR7–103B of the Code of Professional Responsibility of the American Bar Association and Rule 17 of the Rules of Criminal Procedure of the State of Arkansas."

This is a fairly general *Brady* request. Nevertheless, the paucity, and therefore heightened importance of, witnesses in this case, should have drawn the prosecutor's attention to evidence concerning Officer Thomas's credibility. Where, as here, the government presents only one key witness, and that witness is a police officer working with the prosecution, this Court finds that the prosecution has an affirmative duty to check files readily available to it, such as personnel records and criminal record checks, to determine the credibility of said witness. While it is a close call, this Court concludes that the prosecution in this case failed to comply with its duty under *Brady* and its progeny. In this case, that failure violated the fairness requirement of the due process clause. In light of this violation, Petitioner's conviction cannot stand.

### V. Conclusion

The Court has considered three separate attacks on Mr. Devose's conviction: 1) racially discriminatory jury selection; 2) the failure of the trial court to order the disclosure of the confidential informant; and 3) the failure of the prosecution to fulfill its obligations to exercise due diligence in checking the credibility of its key witness and disclosing impeaching evidence to defense counsel. The Court has found that all three issues are meritorious and that each issue individually requires the Court to set aside Petitioner's conviction.

IT IS THEREFORE ORDERED that the petition for writ of habeas corpus is GRANT-ED. If the State of Arkansas decides to retry Petitioner, it must file a notice of its intention to do so with this Court prior to August 30, 1994.

IT IS FURTHER ORDERED that the State of Arkansas be, and it is hereby, DI-RECTED to release Petitioner from the sanction imposed for the instant offenses prior to 5:00 p.m. on August 30, 1994 if the State does not intend to reprosecute Petitioner.

IT IS FURTHER ORDERED that the State of Arkansas be, and it is hereby, DI-RECTED to begin the proceeding to retry Petitioner within 60 calendar days from August 30, 1994 if the State intends to reprosecute him on the instant offense.