******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* MICHAEL ANTHONY GUERRERA
## (SC 19785)

Palmer, McDonald, Robinson, D'Auria,
Mullins, Kahn and Ecker, Js.*

*Syllabus*

Pursuant to *Brady* v. *Maryland* (373 U.S. 83), the state has an obligation to disclose to an accused evidence that is both favorable to the defense and material to the case.

Convicted of the crimes of assault in the first degree, conspiracy to commit assault in the first degree, and tampering with physical evidence, and found in violation of probation, the defendant appealed to the Appellate Court, claiming, inter alia, that the trial court improperly had granted in part motions by the state and the Department of Correction to quash a subpoena issued by the defendant to the department that sought, pursuant to *Brady*, the production of audio recordings made by the department of four codefendants' calls and visits while they all were in the custody of the Commissioner of Correction. The defendant and his four codefendants had been incarcerated in lieu of bail pending trial and, in accordance with department policy, were notified that conversations during all inmate calls and noncontact visits were automatically recorded. Such recordings ordinarily remained in storage for one year, after which time they were automatically erased, unless the department manually preserved them beyond the one year period. Following a request by the office of the state's attorney that the department record the calls and visits of the codefendants, the department assigned a monitor to the case, and, in accordance with department practice, the monitor reviewed approximately 10 percent of the audio recordings of those calls and visits, which represented the calls and visits the department believed to be most likely to bear some relevance to the pending criminal case. If the monitor identified a call or visit that may contain information relevant to the case, the monitor would preserve the recording of that call or visit beyond the one year period and summarize its contents for the state. In response to the defendant's subpoena, the department preserved 1552 recordings of the codefendants' calls and visits that remained in storage. The state and the department claimed in their motions to quash that the defendant's subpoena was issued without any indication that the recordings contained exculpatory information and, further, that producing the recordings would unduly burden the department because its policy required it to review each recording in its entirety prior to its disclosure to an outside party. The state further claimed that the unreviewed recordings were not part of the state's investigation but were identified and ultimately preserved at the express request of the defendant. The trial court granted the motions to quash with respect to the 1552 recordings that were preserved in response to the defendant's subpoena but that had not been reviewed, but ordered the department to provide to the defendant any recordings of the codefendants that the department had reviewed and that concerned the pending case. The trial court rejected the defendant's claim that *Brady* also required the department to provide the 1552 recordings that the department had not reviewed so that he could review them himself. In addressing the defendant's *Brady* claim on appeal, the Appellate Court appeared to assume without deciding that the 1552 recordings, none of which had been reviewed by the department or the state, were part of the state's investigatory file and that the state could be charged with constructive knowledge of their contents. The Appellate Court nevertheless concluded that the state's attorney had no obligation to examine the state's own investigatory file because the defendant had not made an adequate showing that the file contained exculpatory information. On the granting of certification, the defendant appealed to this court. *Held* that, in the absence of an appropriate showing by the defendant of at least some likelihood that the 1552 recordings contained exculpatory information, the state had no obligation, under the particular facts of

this case, either to examine those recordings or to obtain and make them available to the defendant for his review, and, accordingly, the Appellate Court correctly concluded that the trial court had properly granted in part the state's and the department's motions to quash the defendant's subpoena: the assumption that the 1552 recordings, none of which was reviewed by the department, were identified and preserved in furtherance of the state's investigation and were thus part of the state's investigatory file was contradicted by the record, there having been no evidence to contradict the monitor's testimony that the 1552 recordings were preserved in accordance with the department's obligation in light of the defendant's subpoena rather than as part of the department's monitoring process as requested by the state's attorney; moreover, because it was undisputed that the department reviewed only 10 percent of the recordings in response to the state's request for monitoring and the state never pursued a request that the department review all of the recordings or undertook to obtain and review any of the remaining recordings, the state's investigation with respect to the recordings in the department's possession was limited to the 10 percent of the recordings that the department did review, and the trial court correctly determined that the state's obligations under *Brady* extended to those particular recordings.

(*One justice concurring separately*)

Argued September 21, 2017—officially released May 7, 2019

*Procedural History*

Two substitute informations charging the defendant, in the first case, with the crimes of assault in the first degree, conspiracy to commit assault in the first degree, unlawful restraint in the first degree and tampering with physical evidence, and, in the second case, with the crimes of murder, conspiracy to commit murder, felony murder, kidnapping in the first degree and conspiracy to commit kidnapping in the first degree, and information, in a third case, charging the defendant with violation of probation, brought to the Superior Court in the judicial district of New Britain where the cases were consolidated; thereafter, the court, *Alander, J.*, granted in part the motions to quash a subpoena duces tecum filed by the state et al.; subsequently, the first two cases were tried to the jury before *Alander, J.*; verdicts of guilty of assault in the first degree, conspiracy to commit assault in the first degree and tampering with physical evidence; thereafter, the court declared a mistrial as to the charges of murder, felony murder, kidnapping in the first degree and conspiracy to commit kidnapping in the first degree and granted the defendant's motion to dismiss the charge of conspiracy to commit kidnapping in the first degree; subsequently, the third case was tried to the court; thereafter, the court rendered judgment revoking the defendant's probation and rendered judgments in accordance with the verdicts, and the defendant appealed to the Appellate Court, *Gruendel, Beach* and *Flynn, Js.*, which affirmed the trial court's judgments, and the defendant, on the granting of certification, appealed to this court. *Affirmed.*

*John L. Cordani, Jr.*, with whom, on the brief, was *Damian K. Gunningsmith*, for the appellant (defendant).

*James A. Killen*, senior assistant state's attorney, with whom, on the brief, were *Brian Preleski*, state's

attorney, *Jonathan M. Sousa*, former special deputy assistant state's attorney, and *John H. Malone*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

PALMER, J. It is the policy and practice of the Department of Correction (department) to automatically record the telephone calls and noncontact visits of all inmates, each of whom is given prior notice that such calls and visits are being recorded. The recordings are made for a variety of reasons related to prison safety and administration, and not as part of any investigation into the crimes with which the various inmates have been charged. From time to time, however, the department, upon express request of the state's attorney responsible for prosecuting a particular criminal case, will review some but not all of the calls and visits of those inmates who have been charged in that case. Because the department is acting as an investigative arm of the state in conducting that review, the calls and visits reviewed at the state's attorney's behest are part of the state's investigation into the case such that, like all other material and information gathered or developed as part of the investigation, those calls and visits are subject to the disclosure requirements of *Brady* v. *Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).[1] The sole issue presented by this appeal is whether the inmates charged in such a case, some of whose calls and visits have been reviewed by the department, are entitled, under *Brady*, to a review of *all* of those calls and visits even though the department has limited its review to only some of the recorded conversations. We conclude that no such review is required under the facts and circumstances of the present case.

The defendant, Michael Anthony Guerrera, and four codefendants were charged with various offenses in connection with the assault and murder of the victim, Dylan Sherman. Following their arrest, they were remanded to the custody of the Commissioner of Correction (commissioner) pending trial, at which time the state requested that the department review the telephone calls and noncontact visits of the defendant and his codefendants. In accordance with its practice, the department reviewed only about 10 percent of those voluminous calls and visits, which represented the calls and visits believed by the department to be most likely to bear some relevance to the pending criminal case. Subsequently, the defendant, shortly before trial, issued a subpoena to the department seeking, under *Brady*, the production of more than 1500 audio recordings of the telephone calls and noncontact visits of the defendant's four codefendants that had been made and retained by the department while those codefendants remained in the commissioner's custody prior to trial.[2] The state and the department moved to quash the subpoena, claiming that it was overbroad in that it failed to provide any reason to believe that the recordings contained exculpatory information and, further, that

producing the recordings would place an undue burden on the department because, before any such production, the department would be required to review each recording to determine whether it contained any relevant evidence. The trial court granted in part the motions to quash, concluding, inter alia, that, before the department could be compelled to undertake such an extensive review on the defendant's behalf, the defendant was required, in accordance with *Brady*, to make an appropriate threshold showing that the recordings contain evidence favorable to the defendant, a showing that he concededly could not make. A jury thereafter found the defendant guilty of assault in the first degree in violation of General Statutes §§ 53a-59 (a) (1) and 53a-8, conspiracy to commit assault in the first degree in violation of General Statutes §§ 53a-59 (a) (1) and 53a-48 (a), and tampering with physical evidence in violation of General Statutes (Rev. to 2011) § 53a-155 (a) (1), and the trial court rendered judgments in accordance with the verdicts.[3]

On appeal, the Appellate Court affirmed the judgments of the trial court; *State* v. *Guerrera*, 167 Conn. App. 74, 120, 142 A.3d 447 (2016); and we granted the defendant's petition for certification to appeal, limited to the question of whether the Appellate Court properly determined "that the state's attorney's obligation to review [the state's] own investigatory file for *Brady* . . . material . . . applies [only when] the defendant can first make a 'showing' that the file contains exculpatory information . . . ." *State* v. *Guerrera*, 323 Conn. 922, 150 A.3d 1152 (2016). Upon further consideration of the issue presented, however, it is apparent that the certified question is predicated on an assumption that is contradicted by the record, namely, that the recordings at issue were part of the state's investigatory file; they were not a part of the investigation of the state's case against the defendant.[4] Because those recordings were *not* part of that file, we have no cause to answer the question as certified. We must decide, rather, whether the state had an obligation under *Brady* to review the recordings nevertheless.[5] We conclude that the state had no such obligation under the particular facts of this case, and, for that reason, we affirm the judgment of the Appellate Court.

The following undisputed facts and procedural history are relevant to our resolution of the present appeal. On February 22, 2011, the victim was severely beaten and then transported to a wooded area of Terryville where he was bludgeoned to death. His body was found the next day by a hiker, and, soon thereafter, the police developed information that the victim had been murdered by the defendant and his brother, Dennis Guerrera, over a dispute involving money. On February 24, 2011, the two men, along with three others, were arrested and charged with multiple offenses related to the assault and murder of the victim.

Shortly after those arrests, an inspector from the state's attorney's office requested that the department monitor the telephone calls and noncontact visits of the defendant and his four codefendants, all of whom remained incarcerated in lieu of bail pending trial. This request was handled in accordance with department policy, pursuant to which all such inmate calls and visits are automatically recorded with prior notice to every inmate that his or her calls and visits are recorded and subject to monitoring by the department.[6] These recordings are made for prisoner safety and a number of administrative concerns, and are stored for a fixed period of time on servers maintained by an outside vendor. Prior to July, 2012, the vendor preserved the recordings for ninety days, after which time they were automatically erased. Thereafter, however, the department entered into a contract with a new vendor, which was required to preserve the recordings for one year. Both before and after July, 2012, however, to preserve a recording beyond the automatic retention period, the department had to save it to an external drive, which is referred to as "locking" the call.

The department routinely receives requests from the various state's attorney's offices and other investigative agencies to monitor inmate telephone calls. After the receipt of such a request, the department assigns an individual telephone monitor to the case. Because the department maintains that it is not feasible to monitor or review every call of any particular inmate,[7] the department's practice when monitoring calls for such a requesting agency is to focus exclusively on inmate calls occurring soon after that inmate was arrested and incarcerated and shortly before and after the inmate's court dates because, in the view of the department, those are the calls that typically yield information of value to the requesting agency. The monitor assigned to the request decides which calls to listen to, generally without any input from the requesting agency, and will lock a call only if it appears to contain information related to the case. When such a call has been identified and locked, the monitor summarizes its contents in a written report, which is then forwarded to the requesting agency. If the requesting agency wishes to obtain a copy of any such recording, it may do so upon request to the department in accordance with department policy.

The state's request in the present case was assigned to Officer Donald Lavery, a member of the department's Special Intelligence Unit. In keeping with department practice, Lavery limited his review to those calls that were made shortly after the individuals were incarcerated and before and after their court dates, a review that comprised only about 10 percent of the calls of the defendant and his codefendants. Lavery ultimately prepared notes on only a handful of the calls, and he

forwarded those notes to the state's attorney's office. The state, however, never sought to obtain a copy of any of those calls because, after reviewing Lavery's notes, the state's attorney determined that none of the calls was either inculpatory or exculpatory. Moreover, at no time did the state's attorney seek to have the department review additional calls or otherwise undertake to obtain copies of any such additional calls from the department.

On June 27, 2011, defense counsel sent a letter to the department "requesting that all phone calls of [the defendant's codefendants] be recorded and preserved." The letter further stated that, "[a]t some point in the future, I anticipate issuing subpoenas for the recordings of these inmates' calls." On August 15, 2013, the defendant issued a subpoena to the department, directing it to "produce copies of the [codefendants'] recorded conversations, whether on the telephone or during inmate visits . . . ." The state and the department moved to quash the subpoena on the ground that it had been issued without any indication that the recorded conversations contain exculpatory material. They also maintained that compliance with the subpoena would place a significant and unreasonable burden on the department due to the extensive number of recordings involved, all of which, under department policy, would have to be reviewed in their entirety before they could be disclosed to an outside party, a process that, according to the representations of the state's attorney, could take anywhere from 200 to 1000 hours, depending on the length of the calls.[8]

The defendant filed an objection to the motions to quash in which he asserted, inter alia, that he was in possession of information that, during a recorded prison visit between his brother, Dennis, and their mother, Naomi Ball, Dennis had informed Ball that the defendant was not involved in the victim's murder. On the basis of this information, the defendant claimed that the exculpatory statement allegedly made by Dennis to their mother provided reason to believe that the other codefendants also might have revealed exculpatory information during their phone calls or visits.

At the hearing on the motions to quash, Lavery testified that he had not locked any calls in response to the state's request for monitoring,[9] but, after receiving the defendant's subpoena, he "went back and started locking" all of the codefendants' calls that were still on the server. A total of 1552 calls were ultimately locked.[10] When the court asked whether he had listened to any of the calls after they were locked in response to the subpoena, Lavery responded that he had not. After Lavery's testimony that he had not locked any calls in response to the state's request for monitoring, the trial court expressed confusion, stating that it was under the impression that all of the codefendants' calls were

locked as soon as the department received the state's request. Lavery explained that, because calls must be locked "one at a time and it takes a very long time" to lock a call, it is his general practice to lock only calls that he has actually reviewed and that he believes may contain information relevant to the case of interest. The court then asked Lavery: "Oh, so they're not automatically locked? . . . [Y]ou only lock the ones you've listened to if there's something of note?" Lavery responded, "right." The court then stated: "So it's not accurate for me to think, which is what I thought, that once the request comes in every call [is locked]. Nothing like that was done?" Lavery responded, "[n]o." The court then stated, "[s]o [all the older] calls are gone. They're not preserved. If [a call] was made in March of 2011 [when the state requested monitoring] under the old system, it would have [been] held for ninety days. So they don't exist anymore, right?" Lavery responded, "[y]es." Finally, the court asked Lavery again why he had locked the 1552 calls at issue. Lavery responded that he had locked them to comply with the defendant's subpoena "so we wouldn't lose them," to which the court responded: "Okay. Understood."

Following the hearing on the motions to quash, the trial court issued a memorandum of decision granting the motions with respect to the 1552 calls that were locked in response to the defendant's subpoena but remained unreviewed. In doing so, the court observed that of the calls that Lavery had reviewed, but which did not include any of the 1552 calls locked in response to the defendant's subpoena, only a few of them contained conversations that referred to the crime or otherwise related in some way to the defendant's case. "Given these statistics," the court stated, "the defendant's request for documents is overbroad. It clearly sweeps up calls that have no demonstrated relevance to the matter before the court. It would also impose a substantial burden on [the department] to review each of these [1552] calls to determine which calls contain relevant statements." In reaching its decision, the court rejected the defendant's contention that, because a few of the calls that Lavery reviewed contained some information that related generally to the case, it was reasonable to infer that some of the 1552 calls would contain exculpatory material. The court stated that the defendant had presented no evidence that the codefendants "did in fact make any other calls containing relevant material, other than those already identified by [the department] and, if [they did], which calls contain [that] material. The defendant seeks to obtain [more than 1500] calls in the blind hope that some of them may contain relevant material. That effort is a classic fishing expedition."

The trial court next addressed the defendant's claim that "he is entitled to obtain copies of all [1552] calls so that he can review [them] for *Brady* material." (Internal quotation marks omitted.) The court observed that,

although the department "does not generally act as an investigative arm of the state, it did assist the state's attorney's office in the investigation of the crimes at issue here." Citing *Kyles* v. *Whitley*, 514 U.S. 419, 437, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995) (prosecutor has duty to learn of any evidence favorable to defendant that is known to others acting on government's behalf), and *Demers* v. *State*, 209 Conn. 143, 153, 547 A.2d 28 (1988) (same), the court then explained that, for *Brady* purposes, the state's disclosure obligation extends not only to the office of the prosecutor but also to "law enforcement personnel and other arms of the state involved in the investigative aspects of a particular venture." (Internal quotation marks omitted.) The court further observed that, under *United States* v. *Stewart*, 433 F.3d 273, 298 (2d Cir. 2006), "[t]he relevant inquiry for determining whether an individual or entity is an arm of the prosecution for *Brady* purposes is what the person *did*, not who the person is." (Emphasis in original; internal quotation marks omitted.)

The trial court continued: "The state's attorney's office specifically requested that [the department] monitor and review the calls . . . of the [defendant and his] four codefendants. In response to that request, [the department] reviewed approximately 10 percent of [those] calls for any information related to the alleged crimes. In a number of instances, [the department] sent notes to the state's attorney's office detailing the content of calls containing such information. Clearly, [the department] was investigating aspects of the case on behalf of the state's attorney. Consequently, under the facts here, the prosecutor's obligation under *Brady* to disclose exculpatory and favorable information to the defendant extends to information known to [the department]."

Applying these principles to the present case, the court determined that, because Lavery, at the prosecution's request, had reviewed approximately 10 percent of the codefendants' calls, the state's duty under *Brady* to disclose exculpatory information extended to those calls. The court also concluded, however, that the remaining 90 percent of the calls fell outside the state's *Brady* obligations because those calls were never reviewed by the department or the state as part of the investigation of the defendant's case, and, therefore, those calls could not be *known* to the department, or constructively *known by* the state's attorney. Necessary to this conclusion was the court's implicit finding that those calls were not part of the state's investigatory file.

Accordingly, the court denied the motions to quash in part and ordered the department to provide to the defendant "any recorded calls of the codefendants [that the department] has reviewed and [that] concern the pending case . . . including but not limited to: (1) the recorded call of the visit by . . . Ball with Dennis Guer-

rera in which [Dennis] Guerrera [purportedly] discusses the involvement or lack of involvement of the defendant in these crimes, and (2) the recorded calls for which [the department] has provided notes to the state's attorney's office outlining the substance of the calls because the calls refer to matters related to [the] case."[11]

The trial court, however, rejected the defendant's contention that *Brady* also required the department to turn over to the defendant the 1552 recordings that Lavery did not listen to so that the defendant himself could review them for possible *Brady* material. The court explained that, even if there were legal authority for the defendant's request, which there is not; see, e.g., *Pennsylvania* v. *Ritchie*, 480 U.S. 39, 59, 107 S. Ct. 989, 94 L. Ed. 2d 40 (1987) ("A defendant's right to discover exculpatory evidence does not include the unsupervised authority to search through the [government's] files. . . . [T]his court has never held . . . that a defendant alone may make the determination as to the materiality of the information. Settled practice is to the contrary." [Citations omitted.]); the defendant would still be required to make a threshold showing of materiality before the department could be compelled to produce the recordings, a hurdle that the defendant admittedly could not surmount. See, e.g., id., 58 n.15 ("[a defendant], of course, may not require the trial court to search through the [government's] file without first establishing a basis for his claim that it contains material evidence"); *United States* v. *Brandon*, 17 F.3d 409, 456 (1st Cir.) ("to establish a violation of *Brady*, a defendant must provide the court with some indication that the materials to which he . . . needs access contain material and potentially exculpatory evidence"), cert. denied sub nom. *Granoff* v. *United States*, 513 U.S. 820, 1155 S. Ct. 80, 130 L. Ed. 2d 34 (1994), and cert. denied sub nom. *Ward* v. *United States*, 513 U.S. 820, 1155 S. Ct. 80, 130 L. Ed. 2d 34 (1994); *United States* v. *Pou*, 953 F.2d 363, 367 (8th Cir.) (*Brady* does not permit defendant "to conduct an in camera fishing expedition through the government's files"), cert. denied, 504 U.S. 926, 112 S. Ct. 1982, 118 L. Ed. 2d 580 (1992), and cert. denied sub nom. *Mondejar* v. *United States*, 504 U.S. 926, 112 S. Ct. 1982, 118 L. Ed. 2d 580 (1992), and cert. denied, 504 U.S. 926, 112 S. Ct. 1983, 118 L. Ed. 2d 581 (1992); *United States* v. *Navarro*, 737 F.2d 625, 631 (7th Cir.) ("Mere speculation that a government file may contain *Brady* material is not sufficient to require a remand for in camera inspection, much less reversal for a new trial. A due process standard [that] is satisfied by mere speculation would convert *Brady* into a discovery device and impose an undue burden upon the [D]istrict [C]ourt."), cert. denied, 469 U.S. 1020, 105 S. Ct. 438, 83 L. Ed. 2d 364 (1984), and cert. denied sub nom. *Mugercia* v. *United States*, 469 U.S. 1020, 105 S. Ct. 438, 83 L. Ed. 2d 364 (1984).

Several weeks after the court's ruling on the motions

to quash, defense counsel informed the court that he had reviewed the recording of the conversation between the defendant's brother, Dennis, and their mother, which had been turned over to him pursuant to the court's ruling, and that it did not contain exculpatory material as he had been led to believe. At the same time, defense counsel asked that all of the 1552 recordings that had not been turned over to the defense be compiled onto compact discs and marked as an exhibit for purposes of appeal, if necessary. The state opposed the defendant's request, arguing that such an order would place an onerous and undue burden on the department because the department, in accordance with established policy, would be required to review each of the recordings to prevent disclosure of irrelevant, sensitive or personal information, such as inmate medical information. The state also expressed concern that, if the department were to review any recordings not already reviewed, the state could be charged with constructive knowledge of their contents in light of the court's prior ruling that the department was an investigative arm of the state to the extent that it actually had reviewed calls of the codefendants. To address these concerns of the state, the court ordered that the 1552 recordings be filed with the court under seal so as to relieve the department of the need to review them prior to submitting them to the court. The court further stated that, "if [the department], of its own volition, decides to review these 1552 calls for its own administrative purposes, that does not expand the state's attorney's *Brady* obligation because it's not being reviewed for investigative purposes. It's being reviewed for [the department's] own institutional needs."

The case then proceeded to trial, and the defendant was convicted of assault in the first degree, conspiracy to commit assault in the first degree and tampering with physical evidence, and found in violation of probation. The trial court sentenced the defendant to a total effective sentence of thirty-four years imprisonment, followed by ten years of special parole.

The defendant appealed to the Appellate Court, claiming, inter alia, that, because all 1552 recordings were part of the state's investigatory file, the state had an affirmative duty under *Brady* to review them, irrespective of the defendant's inability to establish a reasonable prospect that they contain exculpatory information. The defendant argued that "[t]he state's *Brady* obligation . . . extended to any exculpatory evidence *produced by its investigation, including the [1552] recordings*," and that the state was deemed to have constructive knowledge of the contents of each of those recordings, "regardless of whether the material [was] actually . . . reviewed by the department or the state . . . ." (Emphasis added.) *State* v. *Guerrera*, supra, 167 Conn. App. 86. The state responded that any of the 1552 calls that remained unreviewed were not "produced

by" or otherwise a part of the state's investigation but, rather, were identified and ultimately preserved under seal at the express request of the defendant. See *State* v. *Guerrera*, Conn. Appellate Court Briefs & Appendices, February Term, 2016, State's Brief pp. 18–19. Thus, the state contended, any principal-agent relationship that existed between the state and the department with respect to the calls that the department did review did not extend to those calls. Id., p. 19.

In addressing the defendant's *Brady* claim, the Appellate Court appeared to assume without deciding that the 1552 calls, none of which had ever been reviewed by the department or the state, were part of the state's investigatory file such that the state could be charged with constructive knowledge of their contents. *State* v. *Guerrera*, supra, 167 Conn. App. 88. The Appellate Court explained, however, that, "[s]imply because the state and the department might be deemed to have constructive knowledge of the contents of the recordings does not necessarily indicate that the recordings in fact contained evidence favorable to the defense, as required by the *Brady* test." (Internal quotation marks omitted.) Id. Specifically, the Appellate Court stated: "[T]here is nothing to indicate that the evidence contained in the recordings is even potentially helpful to the defendant. The defendant provided the court with no evidence that any exculpatory information was recorded at all. Indeed, at the hearing on the motion[s] to quash, counsel for the defendant conceded that 'I can't cite anything exculpatory, [but] there may very well be exculpatory information that is not being turned over because nobody listened to it.' " Id., 90.

In support of its conclusion, the Appellate Court cited *State* v. *Colon*, 272 Conn. 106, 267, 864 A.2d 666 (2004), cert. denied, 546 U.S. 848, 126 S. Ct. 102, 163 L. Ed. 2d 116 (2005), in which this court "distinguish[ed] between [a] valid *Brady* violation claim [that] the state with[eld] exculpatory information and [the] claim [of the defendant in *Colon*] that he was entitled to an opportunity to sift through the records of the [O]ffice of the [C]hief [S]tate's [A]ttorney in search of a potential *Brady* violation." (Emphasis omitted; internal quotation marks omitted.) *State* v. *Guerrera*, supra, 167 Conn. App. 89. In light of *Colon*, and because the present case is readily distinguishable from cases, such as *Demers* v. *State*, supra, 209 Conn. 143, that involve the state's obligation to secure the disclosure of *Brady* material located in the files of the police department that conducted the investigation of the case; see id., 153–54; the Appellate Court concluded that the state had no duty "to conduct a more thorough investigation into the voluminous recordings preserved by the department." *State* v. *Guerrera*, supra, 90. The Appellate Court reasoned that, unlike the state's attorney's office in *Demers* that had ready access to a report generated by the investigating police department, the state in the present case did not

have such easy access to the contents of the conversations at issue. "Reviewing an easily available police report; *Demers* v. *State*, supra, [153]; for exculpatory information is a very different venture from ordering the department to listen to more than 1000 phone calls, none of which has been claimed to contain material that would be useful to the defense." (Internal quotation marks omitted.) *State* v. *Guerrera*, supra, 90 n.3.

We granted the defendant's petition for certification to appeal, limited to the issue of whether the Appellate Court correctly determined that the state's attorney had no obligation to examine "[the state's] own investigatory file" for *Brady* material unless the defendant first made an adequate showing that the file contains exculpatory information. *State* v. *Guerrera*, supra, 323 Conn. 922. On appeal, the defendant asserts, inter alia, that the state's attorney had a duty to review all 1552 recordings because "the [department's] choice to lock the calls was made in furtherance of the [department's] investigatory efforts [on behalf of the state] and thus within the scope of the agency found by the trial court." The state argues that the calls were not locked as part of the state's investigation but, rather, were locked in response to the defendant's subpoena, and were never reviewed, and, consequently, they do not fall within the scope of the agency found by the trial court. The state further maintains that the defendant's assertions to the contrary are "misleading and inconsistent with the record," and that this court should reject the defendant's "attempt to support his *Brady* claim . . . with the false notion that the compiling of [the] unreviewed recordings was the state's doing . . . ."

We begin our review of the defendant's claim with a summary of the law governing our disposition of that claim. The state has a duty under *Brady* to disclose to the accused evidence that is both favorable to the defense and material to the case. E.g., *Adams* v. *Commissioner of Correction*, 309 Conn. 359, 369–70, 71 A.3d 512 (2013). As the state's representative, the prosecutor has a "broad obligation to disclose" *Brady* material because principles of fundamental fairness demand no less. *Strickler* v. *Greene*, 527 U.S. 263, 280–82, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999). This obligation extends to evidence favorable to the defense that is not in the possession of the individual prosecutor responsible for trying the case; indeed, the obligation may encompass such evidence even if it is not known to the prosecutor. Id., 280–81. More specifically, the prosecutor's duty of disclosure extends to *Brady* material that is "known to the others acting on the government's behalf in [the] case," including, but not limited to, the police. (Internal quotation marks omitted.) Id., 281, quoting *Kyles* v. *Whitley*, supra, 514 U.S. 437; see also *Demers* v. *State*, supra, 209 Conn. 153 ("[t]he [s]tate's duty of disclosure is imposed not only [on] its prosecutor, but also on the [s]tate as a whole, including its investigative agencies"

[internal quotation marks omitted]). In other words, the prosecutor is deemed to have constructive knowledge of *Brady* material possessed by those acting on the state's behalf. See, e.g., *Demers* v. *State*, supra, 153 (explaining that, if investigating agency were determined to be in possession of exculpatory material, then court "would be compelled to conclude that, constructively, the [s]tate's attorney had both access to and control over" that material). Thus, the prosecutor has a duty to learn of exculpatory evidence in the possession of any entity that is acting as an agent or arm of the state in connection with the particular investigation at issue. See *Strickler* v. *Greene*, supra, 281. Finally, and importantly, "the propriety of imputing knowledge [of exculpatory evidence] to the prosecution is determined by examining the specific circumstances of the person alleged to be an arm of the prosecutor." (Internal quotation marks omitted.) *United States* v. *Stewart*, supra, 433 F.3d 298.

Consistent with the state's contention, it is apparent that the certified question is predicated on a fundamental misapprehension of the record, namely, that the 1552 calls—none of which was reviewed by the department—were identified and preserved in furtherance of the state's investigation. When questioned by the trial court about this precise issue, Lavery stated that he had locked the calls solely to comply with the defendant's subpoena, in order to ensure that they would not be erased pending a decision on the motions to quash. Moreover, when Lavery was questioned by the department's counsel, he was asked, "[w]as that part of the regular monitoring process to lock those [1552 calls]?" After Lavery responded "no," he was asked, "[o]r is that specific to the subpoena [the defendant] sent?" Lavery responded, "I did it for the subpoena." There is nothing in the trial court record to contradict or otherwise call into question this clear and straightforward testimony that the calls were preserved in accordance with the department's obligation in light of the subpoena that had been served on the department by the defendant, and not as part of the department's monitoring process as requested by the state's attorney.

Furthermore, it is undisputed that the department reviewed only approximately 10 percent of the calls in response to the state's request for monitoring. Because the state never pursued a request that the department review *all* of the codefendants' calls and never itself undertook to obtain and review any of the remaining calls, the state's investigation with respect to the recordings in the department's possession was limited to the 10 percent of the calls that the department actually did review. Because that review was undertaken by the department at the state's request, the department was acting as an agent or arm of the state in conducting that review, and, as a result, the recordings actually reviewed must be characterized as part of the state's

investigatory file. Consequently, the trial court correctly determined that the state's obligations under *Brady* extended to those particular recordings. There simply is no basis for concluding, however, that the calls that never were reviewed by the department or otherwise obtained by the state, and that were temporarily saved on the department's server for reasons unrelated to the state's investigation, constituted a part of that investigatory file. This is so because, as we have explained, the department was acting as an investigative arm or agent of the state only with respect to the 10 percent of the calls that Lavery reviewed. Put differently, neither the state nor the department took any action with respect to those unreviewed calls that would make the calls part of the state's investigation of the defendant's case; rather, their nature and character as calls recorded solely for the department's internal security and administrative purposes remained unchanged. Accordingly, in the absence of an appropriate showing by the defendant of at least some likelihood that those calls contain exculpatory information, the trial court also correctly determined that the state had no duty under *Brady* either to examine those calls or to obtain them and make them available to the defendant for his review.

On appeal to the Appellate Court, however, the defendant repeatedly argued that the calls *were* locked in response to the state's request for monitoring and, therefore, should be deemed to be part of the state's investigatory file. Specifically, the defendant argued that, "[w]hile the trial court found [the department] subject to *Brady* as an investigative arm of the state's attorney (like the police), it only found that [the department's] *Brady* obligations extended to the recordings [the department] actually reviewed . . . and not to the calls [*the department*] *collected on behalf of the state's attorney but did not actually review* . . . ." (Emphasis added.) *State* v. *Guerrera*, Conn. Appellate Court Briefs & Appendices, supra, Defendant's Brief p. 9. The defendant further argued that, "[i]n other words, the [department's] actions *on behalf of the state's attorney involved both collection on a compact disc (through the 'locking' procedure) and review*. Thus, the state's argument [that the department was not acting on behalf of the state when it locked the 1552 calls] fails—the [department] was acting on behalf of the state's attorney in both locking (i.e., preserving) the calls and in reviewing only 10 percent of them." (Emphasis altered.) *State* v. *Guerrera*, Conn. Appellate Court Briefs & Appendices, supra, Defendant's Reply Brief p. 4.

In his appeal to this court, the defendant reasserts his contention that the recordings are part of the state's investigatory file because they were locked in response to the state's request for monitoring.[12] As we discussed previously, however, this claim is belied by the uncontested facts. Significantly, the defendant's brief makes no mention of the subpoena that the defendant caused

to be served on the department on August 15, 2013. When challenged at oral argument before this court as to the basis for the defendant's assertion that the recordings were locked in response to the state's request for monitoring, his appellate counsel cited Lavery's testimony at the hearing on the motions to quash: "When I receive[d] a subpoena for the phone calls for the other four [co]defendants, I went back and started locking them . . . . I locked [the calls] for the subpoena just so we made sure we had access." It is clear, however, that the subpoena to which Lavery was referring was the *defendant's* subpoena because no other subpoena was served on the department in this case.

The defendant also seeks to characterize the following language from the trial court's memorandum of decision as a factual finding that the department locked the calls in response to the state's request for monitoring: "Lavery locked all calls made by the four codefendants from approximately August, 2012, to the present." This statement, however, merely establishes that the calls were locked, not *why* they were locked. It is clear from the record that the trial court was aware that the calls were locked to comply with the defendant's subpoena. Indeed, this information was elicited from Lavery under questioning by both the court itself and counsel for the department. Lastly, the defendant seeks to characterize the following sentence in the state's brief to this court as an admission by the state that the calls were locked at the state's request: "[U]pon receiving the state's request . . . Lavery . . . took steps to preserve all recorded phone calls and jailhouse visits for all four alleged coconspirators." As we explained, however, this statement is at odds not only with Lavery's testimony but with all of the state's arguments elsewhere in its brief and in the Appellate Court.[13] Contrary to the defendant's contention, therefore, we do not read the statement as an admission of any sort but merely as an unintended misstatement that is contravened by the entirety of the state's arguments throughout both its briefs and arguments in the trial court, the Appellate Court and this court.

At no time on appeal to the Appellate Court or to this court has the defendant argued that the state had a duty under *Brady* to review the recordings at issue for exculpatory material, even if they were determined *not* to be part of the state's investigatory file. Indeed, in his brief to this court, the defendant takes pains to distinguish the present case from cases such as *United States* v. *Brooks*, 966 F.2d 1500 (D.C. Cir. 1992), which, as the trial court explained, recognized that such a duty may be imposed on the state, even though the alleged *Brady* material is not within the possession of the prosecution or any agency acting on the prosecution's behalf, when the review sought is so limited in scope that it would be "very easy" to accomplish and the defendant

is able to establish "a [nontrivial] prospect that the examination might yield material exculpatory information . . . ."[14] Id., 1504; see also *United States* v. *Joseph*, 996 F.2d 36, 41 (3d Cir.) ("We will not interpret *Brady* to require prosecutors to search their unrelated files to exclude the possibility, however remote, that they contain exculpatory information. . . . [W]e hold [rather] that [when] a prosecutor has no actual knowledge or cause to know of the existence of *Brady* material in a file unrelated to the case under prosecution, a defendant, in order to trigger an examination of such unrelated files, must make a specific request for that information—specific in the sense that it explicitly identifies the desired material and is objectively limited in scope." [Citation omitted.]), cert. denied, 510 U.S. 937, 114 S. Ct. 357, 126 L. Ed. 2d 321 (1993). In reaching its decision in *Brooks*, the court surmised that the "willingness [of some courts] to insist on an affirmative duty of inquiry" in light of the particular facts and circumstances involved—ordinarily, an inquiry into files "maintained by branches of government closely aligned with the prosecution"—"may stem primarily from a sense that an inaccurate conviction based on government failure to turn over an easily turned rock is essentially as offensive as one based on government [nondisclosure]." (Internal quotation marks omitted.) *United States* v. *Brooks*, supra, 1503.

The defendant argues that *Brooks* is inapposite because "[it] involved a defense request for the prosecution to *affirmatively conduct an investigation* that had not yet been performed by affirmatively searching *general* government files," whereas, in the present case, "[t]he defense was not asking the state's attorney or the [department] to perform an investigation that [it was] otherwise unwilling to conduct. The defense simply wanted the state to review the materials it had already gathered in its [own] investigation . . . ." (Emphasis in original.) Consistent with this contention, the defendant notes that the cases cited in his brief are dissimilar to *Brooks* in that all of them "involve . . . investigatory files linked specifically to [the] case,"[15] rather than the "general government files" at issue in *Brooks*. (Emphasis omitted.) The defendant's argument founders on the fact that the calls at issue in the present case simply are not part of the state's investigatory file. As in *Brooks*, this case involves a defense request—in the form of a subpoena—for a search of a government agency's general files, namely, the department's server, that would not otherwise have been performed but for the defendant's request. Cf. *Stevenson* v. *Commissioner of Correction*, 165 Conn. App. 355, 364, 368, 139 A.3d 718 (prosecutor had no duty under *Brady* to disclose internal department files that were generated at request of public defender's office for purely administrative purposes, not in conjunction with state's investigation), cert. denied, 322 Conn. 903, 138 A.3d 933 (2016). In

stark contrast to *Brooks*, however, it can hardly be said that the review of the calls sought by the defendant is limited in scope—those calls number more than 1500, and it would take hundreds of hours to listen to them— and the defendant has provided no evidence to suggest that any such review would result in exculpatory information.[16]

In sum, the undisputed facts demonstrate that the calls at issue in this case, that is, the 1552 calls that were not reviewed by the department, cannot reasonably be characterized as part of the state's investigatory file. Consequently, the defendant's claim that he was entitled to a review of those calls because they were part of the file must fail. In light of the fact that the defendant has provided no other rationale to support his claim of a *Brady* violation, and because we are unaware of any such alternative basis for relief, we reject his assertion that the Appellate Court incorrectly concluded that the trial court properly granted in part the state's and the department's motions to quash.

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.

* This case was originally argued before a panel of this court consisting of Chief Justice Rogers and Justices Palmer, McDonald, Robinson, D'Auria and Espinosa. Thereafter, Chief Justice Rogers and Justice Espinosa retired from this court and did not participate in the consideration of the case. Justices Mullins, Kahn and Ecker were added to the panel and have read the briefs and appendices, and listened to a recording of oral argument prior to participating in this decision.

The listing of justices reflects their seniority status on this court as of the date of oral argument.

[1] In *Brady*, the United States Supreme Court held that the due process clause of the United States constitution requires the state to disclose "evidence favorable to an accused . . . [when] the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady* v. *Maryland*, supra, 373 U.S. 87. For an accused to prevail on a claim under *Brady*, "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the [s]tate, either [wilfully] or inadvertently; and prejudice must have ensued." *Strickler* v. *Greene*, 527 U.S. 263, 281–82, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999).

[2] Although the record is not entirely clear on this point, it does not appear that any of these more than 1500 calls and visits were among the 10 percent of the calls and visits that already had been reviewed by the department at the state's request.

[3] The defendant, who had been tried under three separate informations consolidated for trial, was acquitted of the charges of unlawful restraint in the first degree and conspiracy to commit murder. The jury was unable to reach a verdict as to the charges of murder, felony murder, conspiracy to commit kidnapping in the first degree, and kidnapping in the first degree, and the trial court declared a mistrial as to those charges. In a trial to the court, the defendant was found in violation of probation.

[4] As we explain more fully hereinafter, the state's obligations under *Brady* ordinarily extend only to exculpatory information contained in the state's investigatory file, which includes any exculpatory information known to others actively involved in the investigation. See *Strickler* v. *Greene*, 527 U.S. 263, 280–82, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999). Thus, we use the term "investigatory file" to refer to any and all information obtained in connection with the investigation into a particular criminal case, whether that investigation was undertaken by the state or by others involved in that investigation as an arm of the state.

[5] This court has broad discretion to address any issue within the scope of the certified question, even if the issue was not considered by the Appellate

Court. See, e.g., *McManus* v. *Commissioner of Environmental Protection*, 229 Conn. 654, 661 n.6, 642 A.2d 1199 (1994).

[6] For ease of reference, we refer hereinafter to the inmate telephone calls and noncontact visits collectively as the calls or recordings.

[7] We note that the record does not reflect whether the department owns or licenses any of the various commercially available software solutions, which are regularly used in the discovery process for civil litigation and in corporate compliance operations, to review or analyze large amounts of digital data at a much faster rate than a human could review the same data.

[8] This estimate was so broad because the department had not determined the length of each call.

[9] Although Lavery did provide notes on one or more of the calls he reviewed at the request of the state's attorney, he apparently did not lock those calls, perhaps because they did not contain any evidence deemed to be inculpatory or exculpatory.

[10] The trial court originally estimated the number of those calls to be 1300. Thereafter, however, the court clarified that there were 1552 such calls.

[11] As we previously noted, the department locked the calls of the defendant's four codefendants in August, 2013, in response to the subpoena issued by the defendant to the department at that time. Because the regular practice of the department prior to July, 2012, was to preserve all calls for only ninety days, it appears that the calls identified in the trial court's order— that is, those that had been reviewed by Lavery—were not preserved. There is no claim by the defendant, however, that any failure to preserve them violated *Brady* or otherwise was improper.

[12] For example, in his petition for certification to appeal, the defendant asserted that, "[a]fter [the defendant] and the codefendants were arrested, the state's attorney contacted the [department]. At the state's request, [Lavery] 'locked' the recordings of prison calls made by [the defendant] and the codefendants. . . . [W]hile Lavery created a file (the compact disc) of all of the call recordings, Lavery only *actually* reviewed about 10 percent of them. The other 90 percent remained within the investigative *file* of the state's attorney's 'investigative arm,' the [department], but [they were] never reviewed by anyone for exculpatory information." (Emphasis in original.) In his brief to this court, the defendant likewise argues that Lavery "lock[ed] [his codefendants'] calls that were still available after receiving the state's attorney's request [for monitoring]"; Lavery "collected on behalf of the [s]tate's [a]ttorney [the 1552 calls] but did not actually review [them]"; "Lavery did 'lock' calls that were still available after receiving the state's attorney's request" and that "[t]he 'locking' process preserves the calls on compact discs, and Lavery was able to lock all the available calls from the codefendants from August, 2012, forward"; "[t]he fact that the [department] chose to lock the calls for later review in furtherance of its investigative efforts does not bring that action outside the scope of the [department's] agency"; and "the [department's] choice to lock the calls was made in furtherance of the [department's] investigatory efforts and thus within the scope of the agency found by the trial court." (Emphasis omitted.)

[13] At oral argument, the defendant also directed this court's attention to the testimony of Deputy Warden Armando Valeriano, who testified about the department's policies pertaining to the recording and monitoring of inmate phone calls. The defendant argued that Valeriano's testimony is further proof that the 1552 recordings were locked as part of the state's investigation because Valeriano responded "yes" when asked by the trial court, "[w]hen you get a request from the state's attorney's office, as in this case, to monitor calls, are those recordings then preserved [s]o they won't be destroyed or written over in the normal course of business . . . ?" It is clear, however, that Valeriano was referring to the preservation that occurs automatically, because he then immediately stated that, "[w]ith this new system," inmate calls "are automatically saved for one year. All inmate calls are saved for 365 days," at which time "[t]hat first call drops off. . . . It's automatic through the system." Thus, Valeriano did not testify that the 1552 calls were retrieved from the server and locked for reasons related to the state's investigation. He merely testified that inmate calls are preserved for a period of one year during which time they are available for review if the department should receive such a request. To the extent that there is any ambiguity in Valeriano's testimony, however, the trial court dispelled it later in the hearing, during its colloquy with Lavery, when it asked him: "I'm a little confused. Help me out here. I thought Deputy Warden Valeriano . . . said that once a request comes in all the phone calls are preserved. So when [the state's] request came in [in] March of 2011, [were] all the phone calls

[of] the people who you were asked to monitor . . . preserved or not?" Lavery responded that they were not preserved.

[14] In *Brooks*, the defendant requested that the government examine certain readily identifiable files of its police department for information relating to the suspicious death of the government's chief witness, a police officer employed by that department whose testimony at an earlier trial, which resulted in a guilty verdict that was overturned when the court granted a motion for new trial, was used to convict the defendant at a second trial. *United States* v. *Brooks*, supra, 966 F.2d 1501–1503. The United States District Court had rejected the defendant's request, and, on appeal from that conviction, the United States Court of Appeals for the District of Columbia determined that the defendant was entitled to an examination of those files by the government due to the unusual circumstances surrounding the witness' death, which gave rise to the possibility that she had work-related problems that might reflect adversely on her credibility. Id., 1503–1504. The District of Columbia Circuit Court of Appeals therefore remanded the case to the District Court so that the government could undertake such an examination. Id., 1504.

[15] See, e.g., *United States* v. *Price*, 566 F.3d 900, 908–10 (9th Cir. 2009) (prosecutor was charged with constructive knowledge of information known to police officers involved in investigation); *In re Sealed Case No. 99-3096 (Brady Obligations)*, 185 F.3d 887, 893–96 (D.C. Cir. 1999) (prosecutor had duty to search his own files and police department files for witness cooperation agreements); *United States* v. *Payne*, 63 F.3d 1200, 1208 (2d Cir. 1995) ("[t]he individual prosecutor is presumed to have knowledge of all information gathered in connection with the government's investigation"), cert. denied, 516 U.S. 1165, 116 S. Ct. 1056, 134 L. Ed. 2d 201 (1996); *United States* v. *Martoma*, 990 F. Supp. 2d 458, 462 (S.D.N.Y. 2014) (when prosecutor and another government agency conducted joint investigation, prosecutor had duty to review other agency's investigatory files for exculpatory evidence); *United States* v. *Gupta*, 848 F. Supp. 2d 491, 495 (S.D.N.Y. 2012) ("whe[n] the [g]overnment and another agency decide to investigate the facts of a case together . . . the [g]overnment has an obligation to review the documents arising from those joint efforts to determine whether there is *Brady* material that must be disclosed"); *United States* v. *Salyer*, 271 F.R.D. 148, 155 (E.D. Cal. 2010) (government must review its own file, no matter how voluminous, for *Brady* material); *United States* v. *W. R. Grace*, 401 F. Supp. 2d 1069, 1075–1076 (D. Mont. 2005) (same).

[16] We do not suggest that, if the state has a disclosure obligation under *Brady* with respect to certain information or materials, that obligation is diminished or reduced depending on how burdensome it may be for the state to discharge that obligation. On the contrary, the state's obligation under *Brady* is the same irrespective of how onerous or difficult it may be for the state to comply with *Brady*'s dictates in any given case. The nature of the burden on the state may be considered only in circumstances, akin to those in *Brooks*, in which the court is asked to require the state to track down information that is not part of the state's investigatory file and otherwise may not fall strictly within the requirements of *Brady* but that, nevertheless, should, in fairness, be made available to the defense given the nature of the information and the ease with which the state can obtain it.